| UNITED STATES DISTRICT COURT | FOR PUBLICATION |
|---|---|
| EASTERN DISTRICT OF NEW YORK | |

---------------------------------------------------------- x
DAWN STEPHENSON,

                Petitioner,                          **MEMORANDUM & ORDER**

        - against -                                No. 10-MC-712 (RJD)

UNITED STATES OF AMERICA,

                Respondent.
---------------------------------------------------------- x

RAYMOND J. DEARIE, District Judge:

        In 1993, at the age of 25, Dawn Stephenson pled guilty to bank fraud. I sentenced her to a day in custody, six months home confinement, and four years supervised release. That was over twenty-two years ago. Since then, Ms. Stephenson has turned her life around. She completed her sentence without incident, and immediately began working. She obtained her associate's degree in human services/mental health from LaGuardia Community College, and after she graduated, she was hired by North Shore-LIJ as a coordinator for the trauma team. She has held that position, which is full time and salaried, for the last four years. She appears to be dedicated to her job, hardworking, and interested in the profession. She has also married and is raising three daughters. Importantly, Ms. Stephenson has had no run-ins with law enforcement since her conviction.

        On October 19, 2010, Ms. Stephenson filed a *pro se* petition to expunge the record of her conviction. Ms. Stephenson was then in her last semester in college and interested in pursuing a career in human services or nursing. She expressed concern that her criminal record would be an obstacle to obtaining employment in her chosen field. The government opposed the expungement of Ms. Stephenson's record, arguing that her case does not present the "extreme circumstance" where expungement is warranted. Because it was not clear whether she would

indeed be able to find employment following her schooling, I opted to hold her petition in abeyance, pending further factual development. On June 4, 2015, I wrote to Ms. Stephenson, asking that she update the Court on her personal circumstances. On August 17, 2015, she responded, stating that she is still interested in pursuing a nursing career, but that she believes her criminal record will likely prevent her from receiving a license.

On September 16, 2015, I held a hearing on the application. Ms. Stephenson recounted that upon learning of the licensing requirement for nurses, she called the New York State Division of Licensing Services, and a woman at the Division told her that while licensing applications are considered on a case-by-case basis and a conviction is not a *per se* bar to obtaining a license, "generally, if you have a record, you can't be licensed." Ms. Stephenson stated that after she discovered that her conviction might prevent her from receiving a license, she elected not to continue her education in nursing.

Ms. Stephenson's case is certainly a sympathetic one—and I believe everything about her character suggests she is well-suited for a career in nursing—but based on the current state of the law governing expungement, for the reasons set forth below, I must regretfully deny her petition.

## DISCUSSION

District courts may, in their "equitable discretion," order the expungement of criminal records. United States v. Schnitzer, 567 F.2d 536, 539 (2d Cir. 1977); see also United States v. Doe, 935 F. Supp. 478, 480 (S.D.N.Y. 1996). A request for expungement "usually is granted only in extreme circumstances" after examining it "individually on its merits to determine the proper balancing of the equities." Schnitzer, 567 F.2d at 539-40. In determining whether such circumstances exist, courts must balance "[t]he government's need to maintain arrest records . . . against the harm that the maintenance of arrest records can cause citizens." Id. at 539.

2

"While courts have rarely granted motions to expunge," such requests are granted "as long as sufficiently extraordinary circumstances are present." Doe v. United States, No. 14-MC-1412 (JG), 2015 WL 2452613, at *5 (E.D.N.Y. May 21, 2015) (internal quotation marks and citations omitted). The Second Circuit has noted that extraordinary circumstances exist where "mass arrests rendered judicial determination of probable cause impossible," an arrest was made "to harass civil rights workers," "the police misused the police records," or an arrest was "based on a statute later declared unconstitutional." Schnitzer, 567 F.2d at 540 (citations omitted).

Courts typically find that difficulties in securing employment are not "extraordinary circumstances" justifying expungement. Many courts within this circuit have held, as a rule, that adverse employment consequences are never so "extraordinary" or "extreme" as to warrant expungement. See, e.g., United States v. Daisley, No. 95-M-059 (SMG), 2006 WL 3497855, at *1 (E.D.N.Y. Dec. 5, 2006) ("[C]ourts have consistently held that adverse employment consequences are not sufficient grounds . . . to warrant expunction. . . ."); United States v. Lau, No. 94-CR-1682 (LAP), 2003 WL 22698810, at *3 (S.D.N.Y. Nov. 14, 2003) ("Courts have consistently held that economic hardship or negative employment consequences do not constitute . . . 'extreme circumstances[.]'"); United States v. Melton, No. 90-CR-378 (MHD), 2001 WL 345217, at *1 (S.D.N.Y. Apr. 9, 2001) (stating that the desire to find employment "has been almost uniformly rejected as a basis for expungement"); Slansky v. White, No. 96-CV-2338 (JFK), 1996 WL 312401, at *2 (S.D.N.Y. June 10, 1996) ("[T]he potential adverse effect on [petitioner's] future employment provides insufficient justification, *per se*, for the expungement of his arrest record. . . ."). Other courts have required petitioners to make specific showings that they have repeatedly been rejected from jobs, reasoning that "a generalized fear of adverse employment consequences is insufficient to warrant expungement." Joefield v. United States,

3

No. 13-MC-367, 2013 WL 3972650, at *5 (E.D.N.Y. Aug. 5, 2013) (noting that petitioner "has never been rejected from a job" in her chosen profession); see also United States v. Howard, 275 F. Supp. 2d 260, 263 (N.D.N.Y. 2003) ("[A] bare proclamation that an arrest record makes obtaining a job difficult or impossible" is not "a basis for expungement. . . ."). In the few cases in which expungement has been granted because of adverse employment consequences, petitioners have demonstrated a particularly "dramatic adverse impact" on their ability to work. Doe, 2015 WL 2452613, at *5 (granting expungement where the petitioner demonstrated "dire financial circumstances" and a lengthy history of being denied employment); see also Doe, 935 F. Supp. at 480-81 (finding "exceptional circumstances" warranting expungement where the defendant "demonstrated that this ancient conviction has had an actual impact on his employment status").

Much has changed, however, in the four decades since the Second Circuit first wrote that "extreme circumstances" must be present to warrant expungement. For one, there is now a great deal of solid evidence establishing that a criminal conviction often is a significant obstacle to employment, in some situations even creating the dire financial circumstances that, in turn, are strongly linked with recidivism. A now-countless number of studies have concluded that a conviction—even a very old conviction—is a substantial barrier to employment. See, e.g., James B. Jacobs, The Eternal Criminal Record 275-300 (2015) (describing the many ways in which a criminal record impedes obtaining employment); Jeremy Travis, But They All Come Back: Facing the Challenges of Prisoner Re-entry 151-85 (2005) (discussing employment challenges of released prisoners); Joan Petersilia, When Prisoners Come Home 112-20 (2003) (discussing "employment barriers and workplace restrictions" facing released prisoners). Employers, studies have confirmed, are considerably less likely to hire ex-offenders. While the "ban the box"

4

campaign aimed at persuading employers not to ask about convictions has helped, numerous, palpable pressures nevertheless continue to discourage most employers from hiring individuals with criminal records. These pressures include insurance companies unwilling to cover employees who are former felons, potential negligent hiring liability, and strong societal stigma. See Christopher Stafford, Finding Work: How to Approach the Intersection of Prisoner Reentry, Employment, and Recidivism, 13 Geo. J. on Poverty L. & Pol'y 261, 270 (2006) (discussing how tort laws and pressure from private insurers discourage the hiring of ex-offenders). Many public-sector and regulated occupations are also immediately off limits because of a conviction. See Michael Pinard & Anthony C. Thompson, Offender Reentry and the Collateral Consequences of Criminal Convictions: An Introduction, 30 N.Y.U. Rev. L. & Soc. Change 585, 597 (2006) (noting that "[e]x-offenders are routinely excluded from many employment opportunities that require professional licenses"). The damaging effects of these many obstacles to employment are exacerbated by the fact that many felons struggle to find housing after release from prison, their pre-conviction social networks have been degraded, and their resumes have substantial gaps. See David Wolitz, The Stigma of Conviction: Coram Nobis, Civil Disabilities, and the Right to Clear One's Name, 2009 B.Y.U. L. Rev. 1277, 1340 (2009) (noting the ways in which a conviction "break[s] up the normal social support system though which many people find their jobs").

Finally, there is also an impressive body of proof that unemployment is strongly linked with recidivism. See, e.g., Jeremy Travis, Amy L. Soloman & Michelle Waul, From Prison to Home: The Dimensions and Consequences of Prisoner Reentry 31 (2001); John H. Laub & Robert J. Sampson, Understanding Desistance from Crime, 28 Crime & Just. 1, 17 (2001); Christopher Uggen, Work As a Turning Point in the Life Course of Criminals: A Duration Model

of Age, Employment, and Recidivism, 65 Am. Soc. Rev. 529, 542-43 (2000); Miles D. Harer, Recidivism Among Federal Prisoners Released in 1987 4-5 (1994), http://www.bop.gov/news/ research_projects/published_ reports/recidivism /oreprrecid87.pdf.; Theodore G. Chiricos, Rates of Crime and Unemployment: An Analysis of Aggregate Research Evidence, 34 Soc. Probs. 187, 202 (1987). In light of all of these findings, I question the wisdom of the often-repeated "consensus" that economic hardship or negative employment consequences do not constitute "extreme circumstances" warranting expungement. As Judge John Gleeson recently commented, "[t]he seemingly automatic refusals by judges to expunge convictions when the inability to find employment is the 'only' ground for the application have undervalued the critical role employment plays in re-entry" and is "out of step with public opinion." Doe, 2015 WL 2452613, at *6. If an ex-offender's inability to find employment puts in jeopardy his or her re-entry into society, I am hard pressed to imagine a circumstance more "extreme."

In the present case, Ms. Stephenson is not in such dire straits. She is employed and earns a fair salary above the minimum wage. Unlike Doe, her criminal record is not having a "dramatic adverse impact on her ability to work." Id. at *5. While she testified that she has been denied employment in the past due to her criminal record, presently she works for an employer who to its great credit hired her with knowledge of her conviction.

The principal reason Ms. Stephenson seeks to have her record expunged is her desire to obtain a license to become a nurse. In New York, a criminal conviction is not a *per se* legal bar to obtaining a license as a registered professional nurse or licensed practice nurse. To qualify for a license as a registered professional nurse or licensed practical nurse, however, an applicant must "be of good moral character." See N.Y. Educ. Law § 6905 ("To qualify for a license as a registered professional nurse, an applicant shall . . . be of good moral character as determined by

6

the department[.]"); N.Y. Educ. Law § 6906 ("To qualify for a license as a licensed practical nurse, an applicant shall . . . be of good moral character as determined by the department[.]"); N.Y. Comp. Codes R. & Regs. tit. 8, § 64.3 ("A limited permit to practice as a registered professional nurse or licensed practical nurse may be issued after the applicant has met requirements of . . . moral character. . . ."). Ms. Stephenson is understandably concerned that the "moral character" requirement will function as a *de facto* bar to obtaining a license. That concern is not frivolous. There is evidence that, as a general matter, "moral character" requirements do serve as an obstacle for ex-offenders seeking a license. See Pinard & Thompson, 30 N.Y.U. Rev. L. & Soc. Change at 597 (noting that "good moral character" statutes "pose a significant barrier to the ex-felon obtaining an occupational license" because "licensing boards and agencies have tremendous latitude in defining the term"); Leroy D. Clark, A Civil Rights Task: Removing Barriers to Employment of Ex-Convicts, 38 U.S.F. L. Rev. 193, 194-96 (2004) ("[A] number of licensing agencies utilize a felony conviction as conclusive proof of a lack of 'good moral character.'"); Bruce E. May, The Character Component of Occupational Licensing Laws: A Continuing Barrier to the Ex-Felon's Employment Opportunities, 71 N.D. L. Rev. 187, 210 (1995) (explaining that "moral character" requirements "act[] as a significant obstacle to obtaining a license and employment"). As a 2015 report from the White House concluded, "Licensing regulations often refer broadly to 'good moral character' as a requirement for holding a license, and in practice this has in many cases been interpreted to ban individuals with *any* criminal record." The White House, Occupational Licensing: A Framework for Policymakers, July 2015, https://www.whitehouse.gov/sites/default/files/docs/licensing_ report_final_nonembargo.pdf (emphasis added).

The State of New York, however, has taken steps to reduce unjust discrimination against felons in licensing decisions. Licensing agencies and employers are generally prohibited from discriminating on the basis of criminal history. See N.Y. Exec. Law § 296(15); N.Y. Correct. Law § 752. "This general prohibition advances the rehabilitation and reintegration goals of the Penal Law" and the statutes are intended to facilitate ex-offenders' "efforts to obtain gainful employment." Acosta v. New York City Dep't of Educ., 16 N.Y.3d 309, 320, 946 N.E.2d 731 (2011). In particular, Executive Law § 296(15) makes it

> an unlawful discriminatory practice for any . . . agency . . . to deny any license . . . to any individual by reason of his or her having been convicted of one or more criminal offenses, or by reason of a finding of a lack of 'good moral character' which is based upon his or her having been convicted of one or more criminal offenses. . . .

Additionally, Corrections Law § 752 provides that

> No application for any license . . . shall be denied or acted upon adversely by reason of the individual's having been previously convicted of one or more criminal offenses, or by reason of a finding of lack of 'good moral character' when such finding is based upon the fact that the individual has previously been convicted of one or more criminal offenses, unless: (1) there is a direct relationship between one or more of the previous criminal offenses and the specific license . . . sought . . . or (2) the issuance . . . of the license . . . would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

In making a determination pursuant to § 752 as to whether there is a "direct relationship" between a conviction and the issuance of a license, an agency must consider eight factors specified in Corrections Law § 753(1). See Dempsey v. New York City Dep't of Educ., 25 N.Y.3d 291, 298-99, 33 N.E.3d 485, 489-90 (2015). Even when there is a "direct relationship" between a conviction and the issuance of a license, an ex-offender's certificate of relief from disabilities or certificate of good conduct creates a "presumption of rehabilitation" that must be rebutted by an agency. See N.Y. Correct. Law § 752(2); Bonacorsa v. Van Lindt, 71 N.Y.2d

605, 613, 523 N.E.2d 806, 809-10 (1988).[1]

Here, the evidence establishes that Ms. Stephenson's decades-old conviction for bank fraud has no "direct relationship" to being licensed as a nurse. Her conviction has little, if any, bearing on her ability to perform the duties of a nurse, and considerable time has passed since her conviction. There is ample evidence that Ms. Stephenson has been rehabilitated; if she should obtain a certificate of relief from disability (or if she has already), she will enjoy a presumption to that effect. There is little question, based on my review of her file and her presentation at the Court's hearing, that she is of strong moral character today. As counsel for the government stated after Ms. Stephenson testified, "We can obviously see who we have before us and why she was hired and why she should go on and be able to do things. She has obviously proven herself." As the Court that sentenced Ms. Stephenson over twenty years ago, I am hopeful that a licensing board will take seriously my conclusion that Ms. Stephenson is of sound moral character and well-suited for the nursing profession.

The irony of Ms. Stephenson's case is that precisely because she has been so successful in turning her life around, she has not demonstrated "exceptional circumstances" warranting expungement. She is not unemployed, her current employer is aware of her conviction, and she does not have a recent history of being denied employment because of her conviction. Courts "need not wait for substantial damage to occur before taking remedial equitable action" but there must be some evidence that "damage will indeed accrue." Schnitzer, 567 F.2d at 540. While her conviction complicates the licensing process, it is not a bar, and there are state laws that help to guard against the possibility that she will be denied a nursing license solely on the basis of her 1993 conviction. Under current Second Circuit precedent, gateways to entering a particular

---

[1] Ms. Stephenson has not indicated whether she has sought a certificate of relief from disabilities. While certificates do not expunge a criminal record, such relief may be useful to her in pursuing her career goals.

9

profession—such as licensing—are not so "harsh or unique" to justify expungement. Id.; see also In re Farkas, 783 F. Supp. 102, 104 (E.D.N.Y. 1992) (declining to expunge petitioner's criminal record to facilitate his licensure).

There are 65 million Americans living with criminal convictions and suffering adverse consequences. Against that backdrop, Ms. Stephenson's predicament is not "exceptional"—they are uncomfortably commonplace. While she is not entitled to expungement of her record today given the state of the law, her petition raises the larger question of how we treat convictions and criminal records as a society. Basic values and notions of fairness stemming from our nation's history animate the principle that individuals should be given an opportunity to start afresh or wipe the slate clean. This notion of forgiveness underlies the promise we so extend to individuals making their way through our criminal justice system: if you "pay your debt to society"—whether through a sentence or a fine—you are afforded a second chance in life. Lately, this has been a promise left largely unfulfilled. Criminal records are remarkably public and permanent, and their effects are pernicious. A criminal sentence too often becomes "a lifetime of unemployment." Doe, 2015 WL 2452613, at *5. It is time for a change.

That change could come from Congress, which has twice proposed but never enacted expungement legislation,[2] putting the federal system woefully behind state criminal justice systems. Change could also come from the executive in the form of pardons, which today are only issued in a tiny fraction of cases and almost never years after a sentence is completed. See Leon Neyfakh, The Pardon Process Is Broken, Slate, Sept. 4, 2015. The U.S. Attorney's Office

---

[2] In 2011, Representative Charles Rangel introduced the Second Chance for Ex-Offenders Act of 2011, H.R. 2449, 112th Cong., and Representative Steve Cohen introduced the Fresh Start Act of 2011, H.R. 2065, 112th Cong. Both bills provided for expungement of nonviolent offenses for first-time offenders. Neither bill gained any traction. The Sentencing Reform and Corrections Act of 2015, S. 2123, 114th Cong., if enacted, would provide for expungement of the records of some juvenile offenders. That would be a welcomed change, but additional reform is needed to make available a similar remedy for appropriate adult offenders.

10

or the Department of Justice could change its position on expungement petitions, and only oppose such requests where the government has a compelling interest in the particular case. As a judiciary, it may be time to revisit the standard for granting expungement and consider, based on what we know now, whether expungement should be limited to only the most "exceptional" cases.

* * *

For the foregoing reasons, I am constrained by controlling precedent to deny Ms. Stephenson's application. This denial of the petition is without prejudice to a future application if Ms. Stephenson's circumstances materially change.

SO ORDERED.

Dated: Brooklyn, New York
      October 7, 2015

                                                                                     RAYMOND J. DEARIE
                                                                                     United States District Judge